Filed 9/29/23  In re E.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re E.C. et al., Persons Coming Under the Juvenile Court Law. | D081944 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>J.J.,<br><br>    Defendant and Appellant. | (San Diego County Super. Ct. Nos. J520536A-D) |

APPEAL from orders of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

J.J. (Mother) appeals from orders made pursuant to Welfare and Institutions Code,[1] section 366.26 hearing terminating her parental rights with respect to her four children. Her sole contention is that the juvenile court erred in declining to apply the parent-child relationship exception to adoption. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

*The Agency's Petitions*

This case involves a mother and her four young children, E.C., J.C., V.C., and K.C. In September 2020, the San Diego County Health and Human Services Agency (Agency) filed petitions on behalf of the children alleging a violation of section 300, subdivision (b). At the time, E.C. was eight years old, J.C. was six years old, V.C. was four years old, and K.C. was one year old. The Agency had received multiple child abuse referrals alleging domestic violence, drug use, and concerns for father's mental health.[2]

The Agency's investigation revealed father's history of engaging in erratic, bizarre, and volatile behavior in front of the children, including physically abusing Mother and destroying property. Mother allowed the children to be exposed to this behavior. The Agency's investigation also uncovered Mother's prior deferred judgment for possession of a controlled substance and father's multiple domestic violence charges.

Initially, the juvenile court ordered the children to remain in Mother's home on the condition that the father remain out of the home. The court also

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    The father is the presumed father of all four children and does not appeal. He will be referenced when necessary to address the issues Mother raises on appeal.

2

granted Mother a temporary restraining order against the father. However, just two months later, the court learned Mother was allowing the father to spend time at her home, so it removed the children from Mother's home and placed them with their maternal grandmother.

In January 2021, the court sustained the children's petitions and entered dispositional orders removing the children from their parents' custody and ordering reunification services.

*Reunification Period*

Although the caregiver initially supervised Mother's visits, the caregiver expressed concern that unsafe individuals were transporting Mother to visits. The caregiver also reported that Mother was not adhering to visitation timeframes, as she would arrive several hours late or leave to get something and not return. The Agency provided Mother multiple referrals to a family visitation center to coordinate visits, but Mother failed to communicate with the center, and it cancelled the referrals.

At the contested six-month status review hearing in September 2021, the court denied Mother's request for expanded visitation due to her lack of consistency with the current schedule. The next month, the Agency discontinued Mother's visitation because she was excessively tardy and had several no-shows and late cancellations. Even so, the Agency submitted another referral to the visitation center in November 2021. Mother also had the opportunity to call the children twice a week, but the caregiver reported that Mother would call, but then ask to call back later because she was out shopping, talking on the other line, or driving.

In April 2022, at the contested 12-month status review hearing, the court terminated the parents' services while maintaining "liberal" supervised visitation. Mother continued to miss and arrive late for visits supervised

either by a social worker or the family visitation center. When she did show up, the children were happy to see her, referred to her as "mom" or "mommy," hugged her and often said "I love you." She typically brought activities, gifts, snacks, and food, and would remind them to do things like wash their hands, brush their teeth, and pick up trash. The children mostly separated easily at the end of visits, but sometimes they cried for a few minutes.

*Mother's Incarceration*

In January 2023, Mother was incarcerated for burglary, elder theft by a caretaker, and theft of over $950. Just before Mother was incarcerated, the visitation center rejected the Agency's most recent referral:

> "This is the 12th time receiving the referral. We get as far as setting it up and having the contingency plan for mom to arrive at a certain time before we pick up the children; which still doesn't work out. Due to having to wait for [three] cancellations/no shows this will take time away from another family that could be having visitations as mom has shown time and time again that she cannot make these visits."

The Agency arranged visits consistent with the rules at Mother's facility. Mother had a video visit with the children in March 2023 and was scheduled to have an in-person visit the following month. Mother also called the children multiple times per week and the caregiver reported the calls were appropriate.

*Permanency Planning Hearing*

In April 2023, the juvenile court held a contested 366.26 hearing and received into evidence the Agency's report, seven addendum reports, and Mother's three exhibits, including a visitation calendar, a document containing strategies for abused women, and a letter from Mother's stepmother.

Mother testified that the children generally knew why she was in custody. Since she has been in custody, she has phoned her children as often as possible and has had one video visit and one in-person visit. She has called them five or six different days, taking turns during each time to speak with each child for 15 minutes. At the in-person visit, the children were very excited to see her and jumped up and down. "It's four of them, one of me, and they [were] all going crazy for my attention." They played with toys and wanted to style her hair. They cried at the end of the visit and suggested they would not see her again. She wished she could visit with them more frequently.

Mother testified that she consistently visited her children before she was in custody. She visited them "at least once a week" unless she could not see them because, for example, the children had lice. There were also one or two months she could not see them when her visits were being supervised by the family visitation center. There was another month she did not see the children because she failed to maintain contact with the Agency. She acknowledged that her visits were not as consistent because she "was not very easy to get a hold of." She also acknowledged that her children felt "sad and worried" when she failed to show up for the visits.

According to Mother's testimony, she played with the children and brought them gifts and activities, such as arts and crafts, before she was in custody. They watched movies in the park and had picnics, "slumber part[ies]" and "spa day[s]." Unless they were distracted by a fun activity, the children cried at the end of the visits. They also had video visits a couple times per week unless she did not make it home in time for the call, called late or was shopping. She felt she was "pretty consistent" in talking to them.

Mother acknowledged that she had "made mistakes" in her past where she put herself ahead of her children and placed them in danger by staying in the relationship with the father. She said the children needed her in their lives, that they had a close relationship and bond, and that it was "the worst feeling in the world to not have my children." She "would do anything for them" and wanted to tell them she was sorry.

*The Juvenile Court's Ruling*

The juvenile court found that the children were generally and specifically adoptable. Once the court made that finding and determined that adoption was available, adoption was the "preferred permanent plan" unless an exception applied. The court set forth elements that Mother was required to prove to establish that the parent-child relationship exception applied, including "regular visitation and contact," the "continuation" of a beneficial relationship, and that the "termination of parental rights would be detrimental" to the children. The court then analyzed whether Mother proved each element.

Regarding the first element, the court explained that the evidence "very clearly" demonstrated that "visitation was not consistent and regular." The court gave credit to Mother's efforts to visit while incarcerated but found that she failed to visit consistently when she was "out in the free world." The court pointed out that Mother was late and failed to show up for visits, failed to take advantage of extra visitation that had been offered to her, missed phone calls, and was distracted and not engaged when she did participate in phone calls. The court, therefore, found that Mother failed to satisfy the first element.

Regarding the second element, while the court found there was a relationship, it did not find any evidence the relationship was beneficial to

6

the children.  The court acknowledged the children's attachment and love for Mother, but found the attachment was not beneficial.  The children longed for Mother who was "absent," which created "complicated feelings" that, on the one hand, could illustrate they need her.  However, the court determined "[i]t's also longing for a relationship that just isn't there because of the absence and the inconsistencies."  The court did not find "evidence . . . that this relationship is beneficial, and that's what needs to be shown to the Court."  Although the children referred to Mother as "mom," that is "a fact" and the court cannot "change[ ] that biological connection."  That does not speak to the "beneficial nature of the relationship" and determined Mother failed to satisfy the second element.

Finally, the court analyzed the third element and found that the benefit of a new adoptive home would outweigh any harm the children would experience, even assuming they had a significant positive emotional relationship with Mother.  The court acknowledged that the children would likely suffer "feelings of loss" and "grief," but pointed out this could be "offset by the stability that adoption in general offers" and therapy.  It further acknowledged that it could not consider that the children's caregiver was a relative.

The court terminated parental rights and referred the children for adoption.

## DISCUSSION

Mother contends the juvenile court erred in finding the beneficial parent-child relationship exception did not apply.  We disagree.  Substantial evidence supports the court's findings that Mother did not visit the children consistently and that the children did not have a significant, positive,

7

emotional attachment to her such that they would benefit from a continuing relationship.

A.   *Legal Principles and Standard of Review*

"After reunification services have terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interest of the child including the child's interest in a 'placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.  [Citation.]' " (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)  At a permanency plan hearing, the court may order one of three alternatives: terminate parental rights and order adoption, appoint a legal guardian, or place children in long-term foster care.  If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.  (*Ibid.*; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)  Once the juvenile court finds the child is adoptable, the burden shifts to the parent to demonstrate that a statutory exception applies.  (*Id.* at p. 1225; § 366.26, subd. (c)(1).)  If the parent does not establish the applicability of a statutory exception, the juvenile court must terminate parental rights.  (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)

One exception is when a beneficial parent-child relationship exists. (§ 366.26, subd. (c)(1)(B)(i).)  It applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*)  This exception requires the parent to prove three elements: "1) regular visitation and contact [with the child,] taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to

8

the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence." (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1225 [citing to *In re Caden C.* (2021) 11 Cal.5th 614, 639–640 (*Caden C.*)].) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will not disturb the juvenile court's findings even where substantial evidence to the contrary also exists. (*Caden C.*, at p. 640, citations omitted.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

B. *Analysis*

Mother acknowledges that she "missed some visitation and was late to visits resulting in her visitation referral being canceled at the visitation center multiple times." Nevertheless, she argues that, "despite these problems," she maintained regular visitation and contact with the children through phone calls, in-person visits and zoom meetings. She asserts that she is "not to blame for the lack of visits at the facility" during her current incarceration and, before then, she was "actively in" the children's lives, except for when the children had head lice, when she was "hard to get a hold

9

of," and when she "missed some visits and [there was] a week in November when she was incarcerated."

Although the court found Mother's visits since incarceration were "more consistent," it also determined that her visits before incarceration were inconsistent and irregular. The court correctly pointed out that Mother was routinely late and failed to show for visits, that she did not take advantage of additional visits, that she was often distracted and unengaged when she called the children and sometimes failed to call them at the arranged time. The Agency initially attempted to coordinate visits outside the center but had to discontinue them due to Mother's excessive tardiness and no-shows. Mother continued to miss and arrive late for visits supervised either by a social worker or the family visitation center. The visitation center discontinued Mother's visits when she repeatedly cancelled and failed to show for scheduled visits. When Mother did call the children, she prioritized other aspects of her life and often made excuses to call back later. The court correctly found that the evidence "bears out very clearly" that Mother's "visitation was not consistent and regular."

Based on our own review of the record, we conclude that the parent-child relationship exception does not apply because substantial evidence supports the court's finding that the first element was not met. (*Caden C.*, *supra*, 11 Cal.5th at p. 636 ["[T]he parent asserting the parental benefit exception must show . . . regular visitation and contact."].) Even though that could end our analysis, we nevertheless also consider "evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.' " (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230 [italics added].) Courts consider factors including the age of the child, the amount of time the child spent in the

10

parent's custody, the interaction between parent and child, and the child's needs. (*Caden C.*, at p. 632.) The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*) We look at the evidence supporting what the court did find—even though there may be evidence in the record which might have supported a different conclusion. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 230.)

The court found that the children are "attached to" and "love" Mother. They enjoyed their visits, were affectionate toward her and sometimes cried at the end of the visits. The court, however, did not find that the attachment was "a beneficial attachment" or that the relationship was "beneficial." Rather, the children were "longing for a relationship that just isn't there because of the absence and the inconsistencies."

The court's determination is a reasonable inference from the evidence that Mother did not visit regularly and consistently, and that the children enjoyed visiting with her when she did visit and experienced sadness when she had to leave. (*Caden C.*, *supra*, 11 Cal.5th at p. 641 [where the trial court makes an inference that "can reasonably be deduced from the facts, the reviewing court has no authority to substitute" its own inference for that of the trial court].)

Finally, if a beneficial parent-child relationship existed, then the abuse of discretion standard of review would apply to the court's determination of whether termination of parental rights would be detrimental to the child. When making this discretionary determination, the court weighs the harm to the child of losing the relationship against the benefits of placement in a new, adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Here, the court found that the children "need stability" and "consistency in their lives," and that the "feelings of loss, feelings of grief"

11

would be "offset by the stability that adoption in general offers and therapy and so forth." With that, the court did not find that the children would suffer detriment if their relationship with Mother was terminated. The court's finding is supported by the record of Mother's inconsistent and irregular visits, as discussed above, and by the Agency's conclusion that Mother's inconsistencies "impacted the quality of the parent-child relationship" and exposed the children to a "cycle of instability." The children "expressed their worry" for Mother when she failed to attend visits or was late.

The Agency also was concerned that Mother abused substances. She had another baby in May 2022 and they both tested positive for methamphetamine. Her substance abuse "affected her ability to form relationships with her children." Because she failed to address her substance abuse, she could not demonstrate that she can "safely parent" her children and did not progress to unsupervised visits. Additionally, Mother also continued to "make false promises to the children about returning home to her care."

The court did not abuse its discretion when it found the benefit of a new adoptive home outweighed any detriment the children would suffer if the relationship were terminated. (See, e.g., *In re J.C.* (2014) 226 Cal.App.4th 503, 533 [concluding that the court did not abuse its discretion where "[n]othing in the record suggests the benefit [the child] might gain by continuing her relationship with Mother is outweighed by the well-being she would gain from having a permanent home."].)

The cases cited by Mother do not help her. In contrast to *In re Amber M.* (2002) 103 Cal.App.4th 681, the court here addressed each element of the exception, understood it could not consider that the caregiver was a relative and evaluated substantial evidence of Mother's relationship with the

children.  (*Id.* at pp. 689–691 [reversing order terminating parental rights where it examined exception in "no more than a cursory manner and did not look at the long-term effect on the children of terminating Mother's parental rights."].)  In *In re S.B.* (2008) 164 Cal.App.4th 289, unlike here, the father's regular and consistent contact and visitation there was undisputed.  (*Id.* at p. 298 [reversing order terminating parental rights where "[t]he parties agree [the father] maintained regular, consistent and appropriate visits with [the child] throughout the dependency proceedings."].)  Moreover, we have made clear that "*S.B.* is confined to its extraordinary facts."  (*In re C.F.* (2011) 193 Cal.App.4th 549, 558 [*S.B.* "does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact."].)  Similarly, Mother's reliance on *In re E.T.* (2018) 31 Cal.App.5th 68, is misplaced because here, in contrast to *In re E.T.*, the court made clear it "can't even consider" the fact that the children's caregiver was a relative. (*Id.* at p. 78 [reversing order terminating parental rights where the court might have "considered that the children may have contact with Mother even though her rights were terminated."].)

The record here does not support a conclusion that this is an extraordinary case where preservation of the parent's rights should prevail over the Legislature's preference for adoptive placement.  (*In re J.C.* (2014) 226 Cal.App.4th 503, 533.)  Accordingly, the court did not abuse its discretion terminating Mother's parental relationship after declining to apply the beneficial parent-child relationship exception to adoption.

## DISPOSITION

The orders are affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

BUCHANAN, J.